1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| WILLIAM J. TUMA, doing business as, TUMA AND ASSOCIATES | Case No. 08CV792-BTM (CAB) |
| Plaintiff, | **ORDER RE MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| EATON CORPORATION, | |
| Defendant. | |

11
12
13
14
15
16
17

Defendant Eaton Corporation, formerly doing business as Cutler-Hammer, Inc., moves for summary judgment on Plaintiff's claims for breach of contract, breach of duty of good faith and fair dealing, and violation of the Independent Wholesale Sales Representative Contractual Relations Act (Civil Code § 1738.10 *et seq.*). In the alternative, Defendant moves for partial summary judgment on the issue of the maximum amount of damages recoverable by Plaintiff. For the reasons that follow, this motion is **GRANTED** in part and **DENIED** in part.

18
19
20
21
22
23
24

## I.  BACKGROUND

25

On June 2, 2003, Plaintiff entered into a written Manufacturer's Representative Agreement ("2003 Contract" or "contract") to act as an outside sales representative in the spa market for Defendant – a manufacturer of electrical components, including spa circuit breakers and spa breaker panels. Plaintiff was granted the right to solicit orders for

26
27
28

1    Defendant's products in a defined sales territory from customers that included Watkins

2    Manufacturing ("Watkins") – a major spa company.  *See* Pl. Ex. 7 at 175, 188.  The

3    contract provides that Plaintiff would be paid commissions "on all sales of Products within

4    the Territory."  (*Id.* at 178).  The contract also addresses payment of commissions

5    following termination of the agreement, limiting such payment to orders placed "within

6    thirty (30) days after the effective date of the termination."  (*Id.* at 181)

7         Plaintiff alleges that he worked for four years before finally persuading Watkins to

8    start purchasing Defendant's products.  (FAC ¶ 4, 5)  On July 20, 2007, Watkins placed

9    an order with OneSource, a wholesale electrical distributor, for 500 Eaton breakers to be

10   used in a field test ("field test order").  Defendant does not challenge Plaintiff's contention

11   that Tuma played a major role in securing this order even though this order was placed

12   through a third-party distributor.  *See generally* mem. at 4.  Although it is unclear from the

13   complaint or Plaintiff's opposition, Plaintiff may be seeking recovery of a commission on

14   this order.[1]

15        On August 27, 2007, Defendant's employee, Brian Hulse, sent Plaintiff an email

16   stating that Eaton and Tuma "have mutually agreed to separate our relationship."  *See*

17   Def. Ex. 4; *see also* Opp. at 7.  On November 1, 2007, Defendant sent Plaintiff a letter

18   stating that the 2003 Contract would terminate the following day.  (Def. Ex. 5)

19   Presumably because of the contract's 30-day notice requirement for terminations without

20   cause, the parties agree that December 1, 2007 is the effective date of termination.  *See*

21   Mem. at 6; Def. Statement of Fact # 4; Opp. at 7; Pl. Statement Of Fact # 4.  This letter

22   also states that "even though One Source actually placed the order," Eaton would pay

23   additional compensation of $10,000 to Plaintiff for the field test order "as an

24

---

25        [1]  Although it does not appear that Plaintiff received any commission on this order,
     *see* Mem. at 7, Plaintiff's complaint does not explicitly reference the field test order.  Rather,
26   Plaintiff contends that Defendant "breached its written agreement with Tuma by failing to pay
     commissions due" and that it is entitled to damages that include "lost past . . . commissions."
27   (FAC ¶¶ 8, 9) Although Plaintiff argues that the obligation to pay commissions on a long-term
     pricing agreement between Defendant and Watkins arose prior to his termination, this
28   position does not necessarily foreclose the possibility that "lost past . . . commissions" also
     include commission on the field test order.

1   accommodation" in exchange for Plaintiff's release of all claims under the 2003 Contract.

2   Def. Ex. 5.

3       On March 21, 2008, Defendant and Watkins signed a multi-year pricing agreement

4   ("Watkins Agreement").  Plaintiff contends that he is owed commissions on this

5   agreement, which he characterizes as a "multi-year contract for a three to five year

6   minimum term at a fixed price for sales of circuit breakers."  (Compl. ¶ 5)  Although

7   Plaintiff asserts that he worked with Defendant and Watkins to finalize this agreement

8   prior to his termination, he does not dispute that this agreement was signed – and, *a

9   fortiori*, all orders using the fixed prices set forth in the agreement were placed – later

10  than one month after the effective date of termination.  *See* Pl. Statement Of Fact # 8.

11

12                          **II.  <u>STANDARD</u>**

13      Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil

14  Procedure if the moving party demonstrates the absence of a genuine issue of material

15  fact and entitlement to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S.

16  317, 322 (1986).  A fact is material when, under the governing substantive law, it could

17  affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

18  (1986); *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997).  A dispute is genuine if a

19  reasonable jury could return a verdict for the nonmoving party.  *Anderson*, 477 U.S. at

20  248.

21      A party seeking summary judgment always bears the initial burden of establishing

22  the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  The moving

23  party can satisfy this burden in two ways: (1) by presenting evidence that negates an

24  essential element of the nonmoving party's case; or (2) by demonstrating that the

25  nonmoving party failed to establish an essential element of the nonmoving party's case

26  on which the nonmoving party bears the burden of proving at trial.  *Id.* at 322-23.

27      Once the moving party establishes the absence of genuine issues of material fact,

28  the burden shifts to the nonmoving party to set forth facts showing that a genuine issue of

                                    3                          08CV792-BTM (CAB)

1  disputed fact remains.  *Celotex*, 477 U.S. at 314.  The nonmoving party cannot oppose a

2  properly supported summary judgment motion by "rest[ing] on mere allegations or denials

3  of his pleadings."  *Anderson*, 477 U.S. at 256.  When ruling on a summary judgment

4  motion, the court must view all inferences drawn from the underlying facts in the light

5  most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio*

6  *Corp.*, 475 U.S. 574, 587 (1986).

7

8                          **III.  CHOICE OF LAW**

9          The Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

10  In a diversity action, it is well-settled that a federal court must apply the choice of law

11  rules of the state in which the action was filed, and thus, the Court applies California

12  choice-of-law rules.  *See Trans Meridian Trading, Inc. v. Empresa Nacional de*

13  *Comercializacion de Insumos*, 829 F.2d 949, 953-954 (9th Cir. 1987).  Under California

14  choice-of-law rules, California state law applies, unless the parties raise an objection.

15  *See Hurtado v. Superior Court*, 11 Cal. 3d 574, 580 (1974); *see also Plaspro GMBH v.*

16  *Gens*, No. C 09-04302 PSG,  2011 U.S. Dist. LEXIS 28808, at *8 (N.D. Cal. Mar. 21,

17  2011).

18          Here, none of the parties object to the application of California law, and in fact,

19  both raise arguments based exclusively on California state law.  California state law

20  applies to the instant action.

21

22                          **IV.  DISCUSSION**

23  **A.  Breach Of Contract Claim (First Cause Of Action)**

24          1.  Contractual Right To Commissions On The Watkins Agreement

25          Defendant argues that it is entitled to summary judgment on Plaintiff's breach of

26  contract claim for commissions on the Watkins Agreement because the 2003 Contract

27  precludes payment of commissions on orders accepted more than 30 days after the

28  effective date of termination and the Watkins Agreement was not signed until after this

                                   4

1    "tail period."  The Court agrees.

2

3                        i.  Meaning Of The Termination Clause

4         The parties assert competing views on the meaning of language in the contract

5    regarding the payment of commissions after termination.  Defendant argues that Section

6    15(b) of the 2003 Contract controls the issue of whether Eaton must pay commissions

7    more than thirty days after the effective date of termination.  This provision provides:

8         Termination of this Agreement shall not . . . release Cutler-Hammer from its
          obligations to the Representative for payment of commissions on orders accepted
9         by Cutler-Hammer prior to the effective date of the termination or on orders in
          Cutler-Hammer's possession which are thereafter accepted by Cutler-Hammer, or
10        on orders accepted by Cutler-Hammer within thirty (30) days after the effective
          date of the termination.

11   (Pl. Ex. 7 at 181)

12        Plaintiff, in turn, contends that this provision is not applicable because Plaintiff had

13   not worked to procure "individual 'orders'" from Watkins, but rather worked to procure "a

14   'specific project' and [worked] for 'the establishment of long term (multi-year) purchasing

15   contracts.'"  (Opp. at 9-10)  For those reasons, Plaintiff asserts that Exhibit C is the "key

16   provision" that exclusively applies to Plaintiff's work on the Watkins Agreement.  (Opp. at

17   10)  Exhibit C provides in relevant part, "Note:  For specific project negotiations or the

18   establishment of long term (multi-year) purchasing contracts for any product(s) listed,

19   Cutler-Hammer reserves the right to establish with the Representative a project specific

20   commission rate at the time of quote for sales made under this particular agreement."

21   (Ex. 7 at 185)[2]

22        The Court holds that the only reasonable interpretation of Section 15(b) is that it

23   bars commission payments on <u>all</u> "orders" accepted more than "thirty (30) days after the

24   effective date of the termination," including commissions on any orders made under the

25   long-term pricing agreement allegedly procured by Plaintiff.  "Orders", as the term is

26   _____

27        [2] This parties agreed to a minor contract modification that revised Exhibit C on
     January 1, 2005.  (Def. Ex. 2)  This modification sets forth identical language quoted above
28   regarding Defendant's right to set project specific commission rates for long-term purchasing
     contracts.

                                          5                            08CV792-BTM (CAB)

1    commonly understood and as used elsewhere in the contract, can be a single purchase

2    at a negotiated price or be one placed pursuant a long-term pricing agreement.  *C.f.*

3    Section 4, Pl. Ex. 7 at 177 (describing procedure for acceptance of orders and payment

4    of commissions without reference to the manner by which the order was procured).

5         The contract's reference to "long term (multi-year) purchasing contracts" in Exhibit

6    C does not alter or create ambiguity in this interpretation of Section 15(b).  Exhibit C

7    provides Defendant with the right to establish a project specific commission rate for long-

8    term contracts.  Presumably, pursuant to this provision, Defendant could reach an

9    agreement with a sales representative to create a project specific commission rate that

10   allows for payment of post-termination commissions after the 30-day cut-off date.

11   However, absent such an agreement, Exhibit C in no way limits the language in Section

12   15(b) setting an end date for commissions on all orders – including orders made under

13   long-term pricing agreements.

14

15              ii.  Triggering Event For Payment Of Commissions

16        Although Plaintiff concedes that "[t]he long term multi-year purchase agreement

17   with Watkins was finalized after Eaton terminated Tuma" (opp. at 12), Plaintiff argues that

18   he is owed commissions that accrued before termination because he is entitled to

19   commissions at the moment he "procured" the sale, irrespective of when the transaction

20   was finalized.  In support of this position, Plaintiff contends, by quoting a phrase in

21   Section 9(a), that "[t]he Contract at issue called for commissions on sales 'procured by

22   the Representative.'"  (Opp. at 12).[3]

23        Plaintiff's position lacks merit.  Conferring a right to commissions on orders placed

24

25        [3] To the extent Plaintiff is relying on the procuring cause doctrine, as opposed to
     contractual language, Plaintiff's argument fails.  *See Willson v. Turner Resilient Floors*, 89
     Cal. App. 2d 589, 596 (1949); *Brea v. McGlashan*, 3 Cal. App. 2d 454, 465 (Cal. App. 1934)
26   ("[I]f an agent. . . is the inducing or procuring cause of the contract, he is entitled to the
     commission, even though the principal takes it out of his own hand and completes it.")  This
27   doctrine, is inapplicable where, as here, the contract to which the salesman is a "procuring
     cause" is a pricing agreement, as opposed to a sale upon which commissions would be
28   owed.  *See Schuman v. IKON Office Solutions, Inc.*, No. C 03-4976, 2005 U.S. Dist. LEXIS
     10039, at *26-29 (N.D. Cal. May 10, 2005), *aff'd*, 232 Fed. Appx. 659, 663 (9th Cir. 2007).

1   more than thirty days after the effective date of termination based solely on when the

2   order was procured conflicts with the plain language of Section 15(b).  Section 15(b)

3   provides that the triggering event for the payment of commissions after termination is an

4   accepted order.

5          Other relevant contractual provisions make clear that an order constitutes the final

6   act of a sale.  Section 4 of the agreement directs that commissions on orders are to be

7   determined after acceptance by Defendant and final shipment.  *See* Pl. Ex. 7 at 177

8   ("Acceptance or rejection of such orders and the determination of whether to make final

9   shipment of any order, even though previously accepted, shall be in the sole discretion of

10  Cutler-Hammer.  . . As to any rejected orders, or any orders which are accepted but for

11  which, for any reason, final shipment is not made, the Representative shall not be entitled

12  to a commission.").  Similarly, Section 9(a) – the provision relied upon by Plaintiff –

13  provides that the amount of commission is to be computed by taking into account the

14  cost of delivery.  *See* Pl. Ex. 7 at 178 ("The commission will be computed on the amount

15  of the order procured by the Representative . . . , less any deductions (e.g. freight and

16  transportation charges, taxes, handling charges for minimum orders . . . ) which are

17  included and shown upon such invoice." ).  Thus, the 2003 Contract cannot be

18  reasonably interpreted to allow Plaintiff to recover commissions on orders placed more

19  than thirty days after the effective date of termination based on pre-termination efforts to

20  secure the order.

21         An email stating that Tuma "had landed 'the big fish' at Watkins" and other

22  extrinsic evidence of Tuma being assured that his commission will be protected does not

23  alter this conclusion.[4]  Although extrinsic evidence can be admissible even if the contract

24  is unambiguous on its face, such evidence must be "relevant to prove a meaning to which

25  the language of the instrument is reasonably susceptible."  *Pacific Gas & E. Co. v. G. W.*

26  *Thomas Drayage etc. Co.*, 69 Cal. 2d 33, 37 (1968); *see also Bionghi v. Metro. Water*

27

28         [4] Although this email is referenced in Plaintiff's complaint and moving papers, it is not
    included as an exhibit to Plaintiff's opposition and does not appear to be lodged anywhere
    else on the docket.

08CV792-BTM (CAB)

1   *Dist.*, 70 Cal. App. 4th 1358, 1365 (2d Dist. 1999).  This rule is "restricted to its stated

2   bounds; it does no more than allow extrinsic evidence of the parties' understanding and

3   intended meaning of the words used in their written agreement. " *Id.*

4        Here, the evidence offered by Plaintiff does not "concern the 'circumstances

5   surrounding the making of the agreement' or allow a court to 'place itself in the same

6   situation in which the parties found themselves at the time of contracting.'" *Id.* at 1367

7   (quoting *Pacific Gas & Electric*, 69 Cal. 2d at 40).  Plaintiff points to no evidence that

8   predates contract formation that would provide an alternative meaning for contractual

9   language that requires commissions to be paid after acceptance of the order by

10  Defendant and delivery.  Moreover, Plaintiff does not and cannot assert that the

11  individuals who provided assurances to Plaintiff regarding commission payments had

12  authority to enter into or alter the contract on behalf of Defendant.  *See* Pl. Statement Of

13  Fact # 37 (referencing statements by Watkins employee); Pl. Ex. 1 at 7-9 (deposition of

14  Brian Hulse, Plaintiff's "direct liaison", referencing a conversation with Plaintiff where Mr.

15  Hulse stated his belief that Plaintiff would be compensated for the Watkins Agreement

16  but acknowledging that he has never seen "any agreements the company has with sales

17  reps" and that the payment of commissions was "outside the scope" of his job).

18  Accordingly, the Court holds that as a matter of law, the express terms of the 2003

19  Contract bar Plaintiff from recovering commissions on the Watkins Agreement.[5]

20  _____

21       [5] In a footnote, Plaintiff asserts that if the contract results in "forfeiture of commissions on long term multi-year purchase contracts, as well as isolated orders," the Court should find the contract to be unconscionable as a matter of law.  (Opp. at 13 n.4)  As an initial matter,

22  the exercise of Defendant's right to terminate Plaintiff without cause and to bar payment of commissions after a cutoff date did not cause a forfeiture of rights that had come to fruition

23  as of the date of termination.  It is undisputed that the Watkins Agreement was not signed until after the tail period following termination.  Moreover, under the terms of the 2003

24  Contract, had he not been terminated, Plaintiff still would not have been entitled to commission on the Watkins Agreement but rather would only be entitled to commissions

25  when orders were actually accepted and shipped.
         Plaintiff's unconscionability argument lacks merit.  Plaintiff is entitled to commission

26  payments on all orders accepted or pending as of thirty days after the effective date of termination.  In this context, setting an end date for commissions paid on all orders is not

27  substantively unconscionable.  *See Bosinger v. Belden CDT, Inc.*, 358 Fed. Appx. 812, 814 (9th Cir. 2009) ("A contract provision terminating [plaintiff's] commissions after thirty days is

28  not 'unduly harsh or oppressive' as to 'shock the conscience.'") (citation omitted). Additionally, Plaintiff presents no evidence to support a finding of procedural

2. <u>Contractual Right To Commissions On The Field Test Order</u>

Unlike the Watkins Agreement, the field test order was made prior to Plaintiff's termination.  Thus, a claim for commission on this order would be unaffected by contract provisions limiting post-termination commission payments.  Accordingly, it is necessary to address Defendant's additional basis for summary judgment on all breach of contract claims:  that it "had a contractual right to sell through distributors."  (Mem. at 6)  Defendant asserts that when sales are made through distributors but with the cooperation of a sales representative, Defendant has sole discretion to determine how the commission is apportioned, thereby negating Plaintiff's right to full commission on the field test order, which was sold through OneSource.  *See* mem. at 6-7.

Plaintiff does not challenge Defendant's contention that Eaton had a contractual right to sell through distributors in Tuma's territory and that the field test order was placed through a distributor and not through Tuma.  However, Plaintiff asserts that Section 9(c) – the contractual provision providing Defendant with the sole right to determine the apportionment of commissions on sales involving the efforts of a sales representative and a distributor – does not apply to sales made within Tuma's territory.  Plaintiff argues that "[t]he introductory clause states that the provision is in reference to sales outside an assigned territory rather than to all sales."  (Opp. at 16)  Section 9(c) reads in full:

> Commissions will generally be paid to the Representative only on sales of products within the territory.  However, Cutler-Hammer and the Representative recognize that occasions may arise which will require cooperation of Representatives, Cutler-Hammer's distributors, and/or Cutler-Hammer.  When such occasions arise, Cutler-Hammer will make the sole determination of whether the Representative will receive the commission or whether the commission will be apportioned.

(Pl. Ex. 7 at 179)

Contrary to Plaintiff's position, the introductory sentence of this provision merely reiterates a limitation found elsewhere in the contract – that a sales representative is only

---

unconscionability.  Plaintiff is an experienced salesman, and although he contends that he signed the contract "without negotiation," (opp. at 4), he does not assert that he was denied an opportunity to negotiate, that the contract was imposed as a condition of employment, or that the termination clause was somehow concealed or buried in fine print.  *See Davis v. O'Melveny & Myers*, 485 F.3d 1066, 1073 (9th Cir. 2007).

08CV792-BTM (CAB)

entitled to commission on sales inside an assigned territory.[6]  The remainder of this provision, sets forth an exception to this general rule.

Because the contract precludes payment of commissions outside of an assigned territory, Plaintiff's asserted meaning of this provision is unreasonable.  Defendant has the right to apportion a commission when sales are made with the "cooperation of Representatives, Cutler-Hammer's distributors, and/or Cutler-Hammer."  It is undisputed that the field test order was made with the cooperation of a distributor, thus triggering Defendant's right to apportion a commission.

Nevertheless, an issue of fact remains as to whether Defendant's offer to pay Plaintiff $10,000 for the field test order in exchange for Plaintiff's release of all claims under the 2003 Contract constitutes such an apportionment.  Defendant asserts no authority for the proposition that an offer made over three months after acceptance of an order that requires a release of claims could be considered a commission payment. Similarly, Defendant offers no details as to the amount of commission paid to the distributor in the field test order.  Thus, even though Defendant has the right to apportion commission on sales within an assigned territory, Defendant has not established that it met its contractual obligation to pay Plaintiff a commission on the field test order. Accordingly, summary judgment is **DENIED** as to Plaintiff's breach of contract claims on the field test order.  Because Defendant has not established that the $10,000 offer constitutes an apportionment of commission and because as set forth below, such an apportionment is subject to the covenant of good faith, Defendant's alternative ground for summary judgment – that Plaintiff's damages are limited to $10,000 – is **DENIED**.

---

[6] Section 2 of the contract provides Plaintiff with "the right to solicit orders only in [an assigned territory] . . . and with [defined customers]." (Pl. Ex. 7 at 175).  Section 9(a) of the contract provides that commissions are limited to such orders: "Except as otherwise set forth herein (shown in Exhibit "G"), Cutler-Hammer will pay the Representative a commission . . . on all sales of Products within the Territory and to the Customers listed." (*Id.* at 178) Exhibit G, in turn, lists "existing projects or agreements where orders have been committed to Cutler-Hammer." (Pl. Exh. at 178)  No such projects are agreements are listed in Exhibit G of Tuma's contract.

08CV792-BTM (CAB)

**B.  Breach Of Duty Of Good Faith And Fair Dealing (Second Cause Of Action)**

Defendant seeks summary judgment on Plaintiff's claim for breach of duty of good faith and fair dealing.  The heart of Plaintiff's claim is that Defendant breached the implied covenant of good faith and fair dealing by terminating Plaintiff for the purpose of preventing Plaintiff from obtaining commissions on the Watkins Agreement.

Under California law, "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement . . . .  The covenant of good faith finds particular application in situations where one party is invested with a discretionary power affecting the rights of another." *Carma Developers, Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal. 4th 342, 371-72 (1992) (quotation omitted). Nevertheless, "if the express purpose of the contract is to grant unfettered discretion, and the contract is otherwise supported by adequate consideration, then the conduct is, by definition, within the reasonable expectation of the parties and can never violate an implied covenant of good faith and fair dealing."  *Wolf v. Walt Disney Pictures & Television*, 162 Cal. App. 4th 1107, 1120-21 (2nd Dist. 2008) (quotation omitted).

Of particular relevance to the instant case, the California Supreme Court has observed in a footnote that "the covenant might be violated if termination of an at-will employee was a mere pretext to cheat the worker out of another contract benefit to which the employee was clearly entitled, such as compensation already earned."  *Guz v. Bechtel National, Inc.*, 24 Cal. 4th 317, 353 n.18 (2000).  Subsequently, several courts have recognized that a cause of action for the breach of the implied covenant can be sustained in such circumstances, as an exception to the general proposition that the exercise of a contractual right agreed to by the parties cannot violate the implied covenant.  *See Daly v. United Healthcare Ins. Co.*, No. 10-CV-03032-LHK, 2010 U.S. Dist. LEXIS 116048, at *14-15 (N.D. Cal. Nov. 1, 2010) (citing cases); *Creager v. Yoshimoto*, No. C 05-01985, 2007 U.S. Dist. LEXIS 77309, at *6-7 (N.D. Cal. Oct. 9, 2007); *Xnergy v. Hess Microgen,  LLC*, No. 06cv343 WQH 2007 U.S. Dist. LEXIS 63812,

at *28-29 (S.D. Cal. Aug. 29, 2007).[7]  Nevertheless, case law applying this exception to

cases where an at-will employee is terminated for the purported purpose of depriving him

of earned commissions is limited.  *See McCollum v. Xcare.net, Inc.*, 212 F. Supp. 2d

1142, 1153 (N.D. Cal. 2002); *Schuman v. IKON Office Solutions, Inc.*, No. C 03-4976,

2005 U.S. Dist. LEXIS 10039, at *29-32 (N.D. Cal. May 10, 2005), *aff'd*, 232 Fed. Appx.

659, 663 (9th Cir. 2007); *c.f. Nein*, 174 Cal. App. 4th at 852 (declining to consider

whether claim for breach of implied covenant could be supported by assertion that

employer terminated at-will employee in order to avoid paying his commission because

this assertion was not raised before the trial court).

Although it is a close question, Plaintiff's breach of the implied covenant claim fails

as to the Watkins agreement.  Plaintiff has not made a sufficient showing of bad faith to

create a genuine issue of material fact.  *See Schuman*, 232 Fed. Appx. at 663 ("In the

absence of evidence of bad faith, or evidence that IKON removed Schuman for the

express purpose of denying him commissions, Schuman failed to create a genuine issue

---

[7] Neither party cites to this case law.  Instead, the parties rely on broad characterizations of California law that ultimately do not control this issue.  Defendant contends that "[a] party that is not in breach of the terms of the contract cannot be in breach of the implied covenant."  (Opp. at 7) While this statement may be true as a general guideline, *see Wolf*, 162 Cal. App. 4th at 1120-21, it does not state a rule of law, as claims for breach of contract and breach of the implied covenant of good faith can be distinct causes of action.  *See Daly*, 2010 U.S. Dist. LEXIS 116048, at *17-18; *Celador Int'l, Ltd. v. Walt Disney Co.*, 347 F. Supp. 2d 846, 854 (C.D. Cal. 2004).  A party may exercise a contractual right in a way that may "frustrate[] a benefit of the contract" thereby breaching the implied covenant without breaching the contract.  *Daly*, 2010 U.S. Dist. LEXIS 116048, at *16 (quoting *Celador*, 347 F. Supp. 2d at 854).
Plaintiff, in turn, contends that "[i]f Eaton 'had the discretionary power' to terminate Tuma and forfeit any subsequent commissions, . . . Eaton 'was required to exercise this discretionary power in a fair and good faith manner.'"  (Opp. at 13 (quoting *Indymac Fed. Bank v. PMI Mortg. Ins. Co.*, No. C 08-04303, 2009 U.S. Dist. LEXIS 14837, at *5-6 (N.D. Cal. Feb. 11, 2009)) Plaintiff, too, overstates the law, as *Indymac* does not stand for the proposition that whenever a contract confers a party with discretionary power, this power must be exercised subject to the implied covenant.  Rather, the court in *Indymac* found that the covenant could be violated when discretionary power was exercised in a manner that "no one could have reasonably expected."  *Id.* at *5.  Here, it can be reasonably expected that Defendant may apply the express terms of a contract conferring it with the right to terminate Plaintiff without cause and bar post-termination commissions after a cutoff date.  Mere exercise of these contractual rights cannot serve as the basis for a violation of the implied covenant.  *See Nein v. HostPro, Inc.*, 174 Cal. App. 4th 833, 852 (Cal. App. 2d Dist. 2009) (no violation of the implied covenant where employer did not pay salesman commission for a transaction solicited before, but concluded after, salesman was terminated, where contract provision expressly barred salesman from recovering post-termination commissions).

of material fact that IKON breached the implied covenant of good faith and fair dealing.")
The gravamen of Plaintiff's assertion of bad faith is that because "Tuma cost Eaton
nothing, other than commissions" his termination prior to consummation of a long-term
pricing agreement could only be for the purpose of depriving him of commissions on
Watkins orders.  (Opp. at 15)  However, Plaintiff acknowledges a business purpose,
independent from a desire to prevent Plaintiff from collecting commissions on future
sales, for the decision to use OneSource, and not Plaintiff, to place future orders.  *See*
opp. at 10 ("As a result of Eaton's alignment with OneSource its business in the market
has gone up dramatically.")   To the extent that Plaintiff is arguing that in order to be
compensated for soliciting Watkins business, he should have been kept on the payroll
indefinitely, so long as Watkins places orders under the Watkins Agreement, such an
expectation would not be legitimate.  *See Schuman*, 2005 U.S. Dist. LEXIS 10039, at
*31-32.

        For these reasons, a case applying California law where a court has found triable
issues on allegations of termination for the purpose of depriving plaintiff of commission
payments is distinguishable.  *See McCollum*, 212 F. Supp. 2d 1142.  In *McCollum*, the
court held that there was a triable issue of fact as to whether the plaintiff was terminated
just two weeks before a $10 million sales signing, so as to "frustrate [the] plaintiff's
legitimate expectations" of receiving commission on the sale.  *Id.* at 1153.  Here, the
Watkins Agreement was not signed until at least three months after the effective date of
Plaintiff's termination and would not, in of itself, have entitled Plaintiff to commissions.
Plaintiff presents no evidence that Defendant sought to delay finalizing the Watkins
Agreement or placing orders pursuant to it, in order to avoid payment of commissions to
Plaintiff during the contract's tail period.  To the contrary, Plaintiff does not challenge
Defendant's contention that the terms related to price and other conditions in the Watkins
agreement were heavily negotiated during the period of time after Plaintiff's termination,
and thus, the signing of the Watkins Agreement was delayed for reasons extraneous to
Plaintiff.  Finally, nothing in the 2003 Contract suggests that

08CV792-BTM (CAB)

Plaintiff should have "legitimately expect[ed]" to remain employed indefinitely in order to collect commissions on orders made under this pricing agreement.  Therefore, the Court **GRANTS** summary judgment in Defendant's favor on Plaintiff's claim for the breach of the duty of good faith and fair dealing on payment of commission on the Watkins Agreement.

However, Defendant is not entitled to summary judgment on a claim for breach of the implied covenant with respect to the field test order.  As noted above, under the contract, Defendant has sole discretion to determine apportionment of commission on this order.  Assuming, *arguendo*, that Defendant's offer of a $10,000 payment constitutes an apportionment of commission owed on this sale, a jury could conclude that tying this offer to a requirement that Plaintiff release all of its claims negates all value to Plaintiff. Effectively refusing to pay any commission on a sale within Plaintiff's territory could constitute the exercise of discretion in a manner that "no one could have reasonably expected."  *Indymac Fed. Bank*, 2009 U.S. Dist. LEXIS 14837, at *5.  Accordingly, a triable issue of fact remains as to whether the apportionment of commission on the field test order violated the implied covenant.

## C. Violation Of Independent Wholesale Sales Representatives Relations Act (Third Cause Of Action)

### 1. Failure To Pay Commissions

Cal Labor Code § 1738.15 establishes liability for willful failure "to pay commissions as provided in the written contract."  Plaintiff asserts that Defendant breached this provision "by failing to pay commissions as provided by the express or implied terms of Plaintiff's written contract."  (FAC ¶ 15(a))  For the reasons set forth above, the only commission Plaintiff may be entitled to under the express or implied terms of the contract is for the field test order.  Plaintiff's § 1738.15 claim fails as to all other orders.

2.  <u>Rate And Method To Calculate Commission</u>

Defendant is not entitled to summary judgment on Plaintiff's § 1738.13 claim.  Cal Labor Code § 1738.13 requires, *inter alia*, that a written contract with a sales representative include "[t]he rate and method by which the commission is computed."  As set forth above, Defendant has the sole right to apportion commissions on sales made with the "cooperation of Representatives, Cutler-Hammer's distributors, and/or Cutler-Hammer."  However, this provision does not set forth either the rate or method of computation of commission.

### V.  <u>CONCLUSION</u>

Defendant's motion for summary judgment is **GRANTED** as to (1) Plaintiff's breach of contract claims for commission payments on the Watkins Agreement; (2) Plaintiff's breach of the implied covenant claim regarding commission payments on the Watkins Agreement; and (3) Plaintiff's Independent Wholesale Sales Representatives Relations Act claims for failure to pay commissions on the Watkins Agreement.

Defendant's motion for summary judgment is **DENIED** as to Plaintiff's breach of contract, breach of implied covenant, and Cal Labor Code § 1738.15  claims for commission payments on the field test order, as well as Plaintiff's § 1738.15  claim. Defendant's alternative motion for summary judgment to limit the amount of damages is **DENIED**.

**IT IS SO ORDERED.**

DATED:  May 23, 2011

_____
Honorable Barry Ted Moskowitz
United States District Judge

08CV792-BTM (CAB)